## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| OLINK PROTEOMICS AB AND OLINK PROTEOMICS INC., <br><br> *Plaintiffs*, <br><br> v. <br><br> ALAMAR BIOSCIENCES, INC., <br><br> *Defendant.* | C.A. No. 23-1303-MN |

## AMENDED COMPLAINT FOR PATENT INFRINGEMENT

Plaintiffs Olink Proteomics AB and Olink Proteomics Inc. (collectively, "Olink" or "Plaintiffs"), by and through their undersigned attorneys, bring this action for patent infringement against Defendant Alamar Biosciences, Inc. ("Alamar" or "Defendant") and allege as follows:

## NATURE OF ACTION

1.      This is an action for patent infringement under the Patent Laws of the United States, 35 U.S.C. §§ 100, *et seq.* arising out of Alamar's manufacture, use, offer for sale, sale, marketing and/or distribution of its Nucleic Acid Linked Immuno-Sandwich Assay ("NULISA") platform (including the NULISAseq platform), used with or without its ARGO system, prior to the expiration of United States Patent No. 7,883,848 ("the '848 patent" or "patent-in-suit"). A copy of the '848 patent is attached as Exhibit A.

## THE PARTIES

2.      Plaintiff Olink Proteomics AB is a corporation organized and existing under the laws of Sweden, with its principal place of business at Salagatan 16F, SE-753 30 Uppsala, Sweden. Olink Proteomics AB is the owner of the '848 patent.

3.      Plaintiff Olink Proteomics Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business at 130 Turner Street, Building 2, Suite 230, Waltham, Massachusetts 02453. Olink Proteomics Inc. holds an exclusive license to the '848 patent.

4.      Upon information and belief, Defendant Alamar Biosciences, Inc. is a corporation organized and existing under the laws of Delaware, with its principal place of business at 47071 Bayside Parkway, Fremont, California 94538.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a).

6.      This Court has personal jurisdiction over Alamar because, *inter alia*, it is a corporation organized and existing under the laws of the State of Delaware with a registered agent in the State of Delaware. Alamar has purposefully availed itself of the privilege of doing business in Delaware directly or indirectly.

7.      Upon information and belief, Alamar has offered for sale, sold, marketed, and/or distributed, and will offer for sale, sell, market and/or distribute its NULISA platform, used with or without its ARGO system, throughout the United States, including the State of Delaware, and will derive substantial revenue therefrom.

8.      Upon information and belief, Alamar intends its NULISA platform, with or without its ARGO system, to be used throughout the United States, including the State of Delaware, which use constitutes patent infringement, which has led and will lead to foreseeable harm and injury to Olink.

9.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1400(b) because Alamar resides in this judicial district.

RLF1 35621030v.1

**FACTUAL BACKGROUND**

A.    **The '848 Patent**

10.    Plaintiff Olink Proteomics AB is the lawful owner by assignment of all rights, title, and interest in and to the '848 patent. Plaintiff Olink Proteomics Inc. is the exclusive licensee of the '848 patent and holds the sole and exclusive right to sue for infringement of the '848 patent. The '848 patent, entitled, "Regulation Analysis by Cis Reactivity, RACR," was duly and legally issued on February 8, 2011, naming Olof Ericsson as inventor. U.S. Application No. 11/483,825, which issued as the '848 patent, claims the benefit of U.S. Provisional Application No. 60/697,415, filed on July 8, 2005.

11.    The '848 patent is generally directed to methods of detecting interactions, *e.g.*, functional interactions, between at least two molecules of interest. In the field of immunoassays, functional interactions play a crucial role in detecting and quantifying specific molecules, typically proteins or other biomolecules.

12.    Independent claim 1 recites the following:

A method of detecting functional interactions between at least two molecules of interest, the method comprising:

   a.  forming a plurality of interactors by coupling each molecule of interest with at least one nucleic acid moiety, the nucleic acid moiety comprising an identification sequence element and an association element;

   b.  forming a plurality of cis-reactive cells wherein a cis-reactive cell comprises at least two interactors bound in proximity to one another by an associated oligonucleotide formed from the association between at least two nucleic acid moieties, wherein the associated oligonucleotide comprises at least two identification elements derived from the at least two nucleic acid moieties;

   c.  subjecting the plurality of cis-reactive cells to conditions which stimulate a desired functional interaction having a detectable trace;

3

d.  selecting all cis-reactive cells exhibiting the detectable trace; and

e.  subjecting the associated oligonucleotides from the cis-reactive cells selected in step (d) to an analysis that permits detection of the at least two identification sequence elements.

13.    After Olink filed its original complaint in this matter, Alamar challenged the validity of the '848 patent in an *inter partes* review proceeding before the Patent Trial and Appeal Board ("PTAB") at the United States Patent and Trademark Office ("USPTO"). In its Final Written Decision, the PTAB determined that Alamar, despite raising four grounds, "ha[d] not demonstrated by a preponderance of the evidence that claims 1–20 of U.S. Patent No. 7,883,848 are unpatentable." *See* Ex. B at 44 (Final Written Decision, *Alamar Biosciences, Inc. v. Olink Proteomics AB*, IPR2024-01353 (P.T.A.B. March 4, 2026), Paper 40).

14.    The claims of the '848 patent are valid and enforceable, as the PTAB's decision demonstrates.

**B.    Development of Olink's Patented Technology**

15.    Olink is a global leader in the field of proteomic analysis and traces its origins to 2004 when Olink Proteomics AB was founded to develop and commercialize the groundbreaking Proximity Ligation Assay ("PLA"), invented by its founders. In PLA, pairs of antibodies are used, each linked to a DNA oligonucleotide. When the antibodies bind to their respective target proteins, the DNA oligonucleotides come into proximity. This proximity allows the DNA oligonucleotides to hybridize to a splint oligonucleotide, then ligate, creating a unique DNA sequence that can be detected and quantified using various methods, such as microscopy, quantitative Polymerase Chain Reaction ("qPCR") or Next Generation Sequencing ("NGS"). The generated signals are proportional to the amount of the target proteins present in the sample, making PLA a valuable tool for quantitative protein analysis.

4

RLF1 35621030v.1

16.    Olink Proteomics AB obtained several patents relating to PLA technology, including the '848 patent, and subsequently entered into a number of agreements with external parties for the development, commercialization, and distribution of products implementing Olink's patented PLA technology.

17.    Employees of Olink Proteomics AB subsequently invented the Proximity Extension Assay ("PEA"). Building on similar principles as PLA, PEA was developed to be a more robust method, in particular for analyzing blood-derived samples. PEA differs from PLA in that the DNA oligonucleotides linked to the antibodies hybridize to each other (instead of a splint oligonucleotide) and are extended by a polymerase to form a full double-stranded DNA molecule for analysis, but otherwise functions similarly in creating a unique DNA sequence for detection and quantification.

18.    Olink provides several PEA-based solutions for protein biomarker discovery and analysis. For example, Olink offers "Olink Explore HT," a  platform that enables researchers to simultaneously measure thousands of proteins in a highly multiplexed manner using PEA, *see* Ex. C, "Olink Reveal," which enables multiplexed measurement of over 1,000 proteins, *see* Ex. D, "Olink Target," which enables measurement of between 42 and 96 proteins for more targeted research, *see* Ex. E, and customizable panels such as "Olink Focus" and "Olink Flex" that enable measurement of a small number of proteins at the same time, *see* Ex. F, Ex. G. Olink also offers the "Olink Signature Q100" for use with the Olink Target, Olink Focus and Olink Flex. *See* Ex. H.

**C.    Alamar's NULISA Platform and ARGO System**

19.    Alamar's NULISA platform is a biomarker detection and quantification assay for proteins which may be run on Alamar's ARGO System, "a fully automated, high-throughput precision proteomics platform." *See* Ex. I at 1.

20.     Alamar offers consumables as part of an "integrated platform" with the NULISA platform and the ARGO system. *See* Ex. J at 1. These consumables include panels designed to enable research into neurodegenerative diseases, inflammatory pathways, and biomarkers of interest, such as Alamar's "NULISAseq CNS Disease Panel 120," "NULISAseq Neuro 220 Panel," "NULISAseq Inflammation Panel 250," "NULISAseq Mouse Panel 120," "NULISAqpcr Single-Plex Assays," "NULISAqpcr Alzheimer's Disease 5plex," and custom kits for other proteomic research. *See id*. at 129–130. Alamar also "provide[s] all the necessary consumables to run on the ARGO HT System." *See id*. at 129.

21.     Like Olink's PLA and PEA platforms, Alamar's NULISA platform, used with or without its ARGO system, aims to achieve "superior sensitivity to a proximity extension assay in for detecting biologically important low-abundance biomarkers" and ultra-high sensitivity enables the detection of "previously difficult-to-detect but biologically important, low-abundance biomarkers." *See* Ex. K at Abstract, 2 ("NULISA: a proteomic liquid biopsy platform with attomolar sensitivity and high multiplexing," Nat. Commun. 14(1):7238 (Nov. 9, 2023), co-authored by Wei Feng, Director of R&D at Alamar); *see also* Ex. L at Abstract. In fact, Alamar acknowledges that Olink's PLA technology is the basis of the NULISA platform. *See* Ex. M at 1 ("The NULISA system is based on the proximity litigation assay (PLA) originally commercialized by Olink Bioscience, the forerunner of Olink."); *see also* Ex. K, Ex. L. The NULISA platform, however, is different from traditional PLA in certain respects. Indeed, in order to secure a patent, Alamar has argued to the USPTO that the NULISA platform is distinguishable from several prior art references disclosing various types of proximity ligation (including traditional PLA, circular PLA, and solid-phase PLA). *See, e.g.*, Ex. N at 10, 12, 19 (U.S. Pat. App. No. 17/330,331, Amendment and Response to Non-Final Office Action (Jan. 26, 2023)).

6

22.     As demonstrated in the claim chart (attached as Exhibit O), the use of the NULISA platform with or without the ARGO system practices at least claims 1–8, 11, 12, 14, and 15 of the '848 patent. *See generally* Ex. O; *see also* "The NULISA™ Platform by Alamar Biosciences," YouTube Video, available at: https://www.youtube.com/watch?v=24nVyCoJv4w (the "NULISA Commercial").

23.     As discussed below, the use of the NULISA platform with or without the ARGO system performs all of the steps of claim 1 of the '848 patent. By performing these steps, the NULISA platform, used with or without its ARGO system, "detect[s] functional interactions between at least two molecules of interest." In particular, the NULISA platform, used with or without its ARGO system, detects a ligation interaction between the antibodies in the NULISA probes.

24.     With respect to step a of claim 1 of the '848 patent, the NULISA platform, used with or without its ARGO system, uses probes consisting of an antibody (a "molecule of interest") coupled with (*e.g.*, conjugated to) a nucleic acid moiety (double-stranded or partially double-stranded oligonucleotides). These form "a plurality of interactors."

25.     The plurality of interactors in the NULISA platform, used with or without its ARGO system, include matched antibody pairs coupled with oligonucleotides. Specifically, one antibody (the "capture antibody") is conjugated to a partially double-stranded oligonucleotide containing a poly-A tail and the other antibody (the "detection antibody") is conjugated to a partially double-stranded biotinylated oligonucleotide. *See* Ex. K at 10; *see also* Ex. L at 20–21. The resulting antibody-oligonucleotide conjugates are the "interactors" in NULISA.

26.     The nucleic acid moieties conjugated to each antibody pair in the NULISA platform, used with or without its ARGO system, each contain a claimed "identification sequence

RLF1 35621030v.1

element" as the oligonucleotides conjugated to both the "capture antibody" and "detection antibody" consist of partially double-stranded DNA containing a target-specific barcode for detection (referred to in the NULISA platform as a target-specific molecular identifier or "TMI"). For the NULISA multiplex assays, a DNA strand containing a further barcode, unique to a specific sample, is ligated between the two oligos.

27.    The nucleic acid moieties conjugated to each antibody pair in the NULISA platform, used with or without the ARGO system, also satisfy the claimed "association element" that facilitates association between the DNA probe arms as "a ligation reaction mix containing T4 DNA ligase and a specific DNA ligator sequence is added to the streptavidin beads, allowing the ligation of the proximal ends of the DNA attached to the paired antibodies. . . ." *See* Ex. K at 2; *see also* Ex. L at 6.

28.    As pertinent to step b of claim 1 of the '848 patent, a highly specific immunocomplex forms when a specific protein target is present in the sample while using the NULISA platform—that is, the two NULISA probes bind to an analyte, bringing the two probes into close proximity to one another. In fact, the NULISA platform functions so that "[w]hen both antibodies bind to the target in a sample, an immunocomplex is formed. The immunocomplexes are captured by paramagnetic oligo-dT beads via dT-polyA hybridization." *See* Ex. K at 2; *see also* Ex. L at 6. The immunocomplexes are then washed, the oligo-dT beads are removed, and "a second set of paramagnetic beads coated with streptavidin is introduced to capture the immunocomplexes a second time." *See* Ex. K at 2; *see also* Ex. L at 6. After the streptavidin beads are introduced, "a ligation reaction mix containing T4 DNA ligase and a specific DNA ligator sequence is added to the streptavidin beads. . . ." *See* Ex. K at 2; *see also* Ex. L at 6. By adding the specific DNA ligator sequence, the two NULISA probes become bound in proximity to one

8

another by an associated oligonucleotide, formed when the DNA ligator hybridizes to each oligonucleotide arm on the NULISA probes.

29.    In other words, with respect to step b of claim 1 of the '848 patent, at least two interactors (the NULISA probes) are bound in proximity to one another by the "specific DNA ligator sequence,"—a single-stranded DNA sequence that simultaneously hybridizes to both of the nucleic acid moieties (*see* Ex. K at 2; *see also* Ex. L at 6)—thereby forming a "cis-reactive cell." The cis-reactive cell includes a double-stranded DNA molecule connecting the interactors, *i.e.*, an "associated oligonucleotide," as required by step b.

30.    And, with respect to step c of claim 1 of the '848 patent, introducing the ligation mix in the NULISA platform, used with or without its ARGO system, stimulates a desired functional interaction (ligation) having a detectable trace, since the ligation reaction produces a ligated nucleic acid as a detectable trace. *See* Ex. K at 2, 10; *see also* Ex. L at 6, 19–20.

31.    The NULISA platform, used with or without its ARGO system, also practices claim limitations related to the "detectable trace" of step d of claim 1 of the '848 patent. Specifically, the levels of "[t]he DNA reporter can then be quantified by quantitative PCR [] or NGS []" and the key aspect that Alamar touts regarding the NULISA platform—the "highly specific immunocomplex" that forms when the target protein is present in the sample—practice the claim limitation "selecting all cis-reactive cells exhibiting the detectable trace" as a result of NULISA's "dual capture and release mechanism." *See* Ex. K at Abstract, 2; *see also* Ex. L at Abstract; the NULISA Commercial. The NULISA platform accomplishes this by collecting an "eluate" consisting of "reporter molecules" following "ligation and one additional wash." *See* Ex. K at 10; *see also* Ex. L at 20–21.

9

32. Additionally, with respect to step e of claim 1 of the '848 patent, the qPCR and NGS analyses permit detection of the "target-specific (TMI) barcodes" of the DNA reporter which comprise the identification sequence elements of the NULISA probes. *See* Ex. K at 2, 11, Fig. 1; *see also* Ex. L at 7, 16, 23, 30, Fig. 1.

33. Upon information and belief, the NULISA platform is especially adapted to be used with a Next Generation Sequencing ("NGS") instrument, and Alamar promotes the use of its ARGO system to be used in conjunction with an NGS instrument.

34. The NULISA platform, used with or without its ARGO system, also practices at least claims 2–8, 11, 12, 14, and 15 of the '848 patent. *See generally* Ex. O.

**D.      Alamar's Infringing Conduct and Knowledge of the '848 Patent**

35. Alamar has and continues to actively market, offer to sell, and/or sell its NULISA platform and ARGO system.

36. On or around April 13, 2023, Alamar announced the unveiling of its NULISA platform for "an early-access release later this year and a broad commercial launch in 2024." *See* Ex. M at 1.

37. In additional to the early-release and commercial launch, Alamar also advertised that its NULISA platform was available "today through [its] Technology Access Program." *See* Ex. P at 3. Alamar also advertised that "Early Access" to its ARGO system will be "[a]vailable [the] 2nd half of 2023." *See* Ex. I at 11. On November 9, 2023, Alamar "announced the successful installation of its ARGO HT System at Stanford University, its first early access site, ahead of its planned commercial launch in 2024." *See* Ex. Q at 2. During early access, before the commercial launch in 2024, Alamar had also "received 10 purchase orders from participants in our early access program and have completed successful instrument placements at 6 sites within the US." *See* Ex. R at 2.

RLF1 35621030v.1

38.     Alamar commercially launched the ARGO system by January 4, 2024. *See id.* at 1; *see also generally* Ex. J. Alamar also continues to launch NULISA products, announcing a launch as recently as March 30, 2026. *See, e.g.*, Ex. S.

39.     By December 31, 2025, less than two years following the release of the ARGO system, "more than 300 customers" had adopted the ARGO system, with "a cumulative installed base of over 100 instruments." Ex. J at 1, 101.

40.     Alamar also launched a variety of assays and other consumables "designed to work together exclusively" with the ARGO system. *Id.* at 16. In 2025, Alamar's average annual consumable pull-through per instrument was roughly $529,000. *Id*. at 1, 103.

41.     Alamar generated a "total revenue of $25.1 million and $74.2 million" for the years ending on December 31, 2024 and December 31, 2025. *Id.* at 2, 120. "Gross margin was 34% and 56%." *Id.* Upon information and belief, a substantial portion of Alamar's revenue resulted from the use of the NULISA platform, including sales of the ARGO system and associated consumables designed for use specifically for the NULISA platform.

42.     Alamar has had knowledge of the '848 patent predating the filing of this lawsuit. On August 11, 2023, Olink's President, Carl Raimond, sent a letter to Alamar's Chief Executive Officer, Yuling Luo, notifying Alamar of several Olink patents, including the '848 patent. Despite this knowledge, the subsequent filing of the present action, and its loss before the PTAB, Alamar continues to knowingly and willfully infringe the '848 patent.

43.     Upon information and belief, Alamar also actively induces infringement under 35 U.S.C. § 271(b) by encouraging others to carry out the claimed methods using the NULISA platform. Specifically, as its advertising, promotional materials, and publications demonstrate, Alamar recommends, promotes, and encourages its customers to use Alamar's NULISA platform

11

in a manner that it knows will infringe one or more claims of the '848 patent. As another example, Alamar provides customers with assays to be used with the NULISA platform and encourages customers to work with Alamar to develop other products to be used with the NULISA platform. Alamar's customers then use the NULISA platform in a manner which directly infringes the claims of the '848 patent.

44.     Upon information and belief, Alamar also contributes to infringement under 35 U.S.C. § 271(c). Alamar knows, both through the August 11, 2023 letter sent to Alamar's Chief Executive Officer, Yuling Luo, and the institution of the present action, that the NULISA platform infringes the '848 patent. Nevertheless, Alamar has persisted in supplying its customers with access to the NULISA platform as well as the ARGO system, which was "built to execute [the] NULISA chemistry," *see* Ex. J. at 2, 120, and "provides an automated method for running NULISA™ assays," *see* Ex. R at 1. Neither the NULISA platform nor the ARGO system are general purpose platforms. The NULISA platform and the ARGO system are especially made or adapted for use in detecting biomarkers and proteins by performing the infringing method discussed above, and have no substantial non-infringing uses. Alamar's customers use the NULISA platform and ARGO system in a manner which directly infringes the claims of the '848 patent. By supplying the NULISA platform and ARGO system in such circumstances, Almar knowingly contributes to infringement of the '848 patent.

## COUNT I
## INFRINGEMENT OF THE '848 PATENT

45.     Olink realleges and incorporates by reference the allegations contained in paragraphs 1–44.

46.     Upon information and belief, Alamar's manufacture, use, offer for sale, sale, marketing and/or distribution of its NULISA platform used with or without its ARGO system,

prior to the expiration of the '848 patent, constitutes direct infringement, either literally or under the doctrine of equivalents, of the '848 patent under at least 35 U.S.C. § 271(a).

47. Upon information and belief, Alamar has been and is actively inducing others to infringe the '848 patent in this District and elsewhere in the United States by making, using, offering to sell, selling, and otherwise marketing and distributing the NULISA platform used with or without the ARGO system in the United States in violation of 35 U.S.C. § 271(b). Alamar's inducement includes, without limitation and with specific intent to encourage direct infringement, knowingly inducing consumers to use the NULISA platform with or without the ARGO system.

48. Upon information and belief, Alamar has been and is contributing to the infringement of the '848 patent in this District and elsewhere in the United States by making, using, offering to sell, selling, importing, and otherwise marketing and distributing the NULISA platform with or without the ARGO system in violation of 35 U.S.C. § 271(c). Upon information and belief, the NULISA platform used with or without the ARGO system is not a staple article or commodity of commerce suitable for substantial noninfringing use.

49. Upon information and belief, Alamar will continue to directly and indirectly infringe the '848 patent unless enjoined by the Court.

50. Alamar's infringement has caused and is continuing to cause Olink to suffer significant damages, and will continue to inflict additional severe and irreparable harm unless stopped.

51. Alamar is knowingly and willfully infringing the '848 patent.

### JURY DEMAND

Olink demands a jury trial for all claims so triable.

RLF1 35621030v.1

**PRAYER FOR RELIEF**

WHEREFORE, Olink requests entry of judgment against Defendant Alamar and respectfully requests the following relief:

A.     A judgment that the '848 patent is infringed by Alamar;

B.     A judgement pursuant to 35 U.S.C. § 283 preliminarily and permanently enjoining Alamar, its officers, agents, servants, employees, parents, subsidiaries, affiliates, other business entities and all other persons acting in concert, participation, or privity with them, and their successors and assigns, from infringing, contributorily infringing, or inducing others to infringe the '848 patent;

C.     A judgement awarding Olink any available damages pursuant to 35 U.S.C. § 284, including, but not limited to, lost profits and/or reasonable royalty;

D.     A judgment in favor of Olink and against Alamar determining that Alamar has willfully and deliberately committed the act of patent infringement, and awarding Olink enhanced damages in light of Alamar's willful infringement pursuant to 35 U.S.C. § 284, including reasonable attorneys' fees and costs;

E.     A judgment that this case is exceptional pursuant to 35 U.S.C. § 285 and that Olink be awarded its attorneys' fees incurred in this action;

F.     An award of costs and expenses in this action to Olink; and

G.     Such other and further relief as the Court deems just and appropriate.

14

OF COUNSEL:

Paul A. Ainsworth
William H. Milliken
Joseph H. Kim
**STERNE, KESSLER, GOLDSTEIN &
    FOX P.L.L.C.**
1101 K Street, NW, 10th Floor
Washington, DC 20005
(202) 371-2600
painsworth@sternekessler.com
wmilliken@sternekessler.com
josephk@sternekessler.com


Dated:  April 2, 2026

*/s/ Kelly E. Farnan*
Kelly E. Farnan (#4395)
Sara M. Metzler (#6509)
**Richards, Layton & Finger, P.A.**
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700
farnan@rlf.com
metzler@rlf.com


*Attorneys for Plaintiffs*
*Olink Proteomics AB and Olink Proteomics Inc.*

15

RLF1 35621030v.1