09:37:42

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

OLINK PROTEOMICS AB, et al., )
)
Plaintiffs, )
) C.A. No. 23-1303(MN)
v. )
)
ALAMAR BIOSCIENCES, INC., )
)
Defendant. )

Monday, July 6, 2026
10:00 a.m.
Protective Order Hearing

844 King Street
Wilmington, Delaware

BEFORE: THE HONORABLE MARYELLEN NOREIKA
United States District Court Judge

APPEARANCES:

RICHARDS LAYTON & FINGER, PA
BY: KELLY E. FARNAN, ESQ.

-and-

STERNE KESSLER GOLDSTEIN & FOX
BY: WILLIAM H. MILLIKEN, ESQ.
BY: PAUL A. AINSWORTH, ESQ.

Counsel for the Plaintiffs

APPEARANCES CONTINUED:

ASHBY & GEDDES
BY: ANDREW COLIN MAYO, ESQ.

-and-

MORRISON & FOERSTER LLP
BY: KELSEY ROBERTS KINGMAN, ESQ.
BY: AARON FOUNTAIN, ESQ.

Counsel for the Defendant

\- - - - - - - - - - - - - -

COURTROOM DEPUTY: All rise. The United States District Court for the District of Delaware is now in session. The Honorable Maryellen Noreika presiding.

09:51:34

10:11:07 THE COURT: Good morning, everyone. Please be seated. Start with some brief introductions.

10:11:09

10:11:14 MS. FARNAN: Good morning, Your Honor. Kelly Farnan from Richards, Layton & Finger on behalf of the Plaintiff, Olink. I am joined by co-counsel from Sterne Kessler Will Milliken.

10:11:16

10:11:19

10:11:21

10:11:21 MR. MILLIKEN: Good morning, Your Honor.

10:11:22 MS. FARNAN: And Paul Ainsworth.

10:11:27 MR. AINSWORTH: Good morning, Your Honor.

THE COURT: Mr. Mayo.

MR. MAYO: Good morning, Your Honor. Andrew Mayo from Ashby & Geddes on behalf of the Defendant, Alamar Biosciences. I'm joined at the counsel table by my co-counsel from Morrison & Foerster, Kelsey Robert Kingman and Aaron Fountain.

THE COURT: Good morning. So we have read the letters and I have looked at the provision and I do appreciate that you came to as much agreement as you did.

I guess I'll tell you where I come out after reading the law that you all cited to me. And that is to me whether someone making a determination on filing future litigation, whether that person is a competitive decisionmaker is kind of a factual decision as to what exactly is their role. Right? So in like the *Blackbird* cases, that was found to be competitive decisionmaking. In other cases maybe it's not.

And so, you know, like outside counsel can advise about whether, you know, you have a good case or you could bring litigation on another patent. But in-house counsel could do the same thing. But I don't know from the declarations that I got from the two folks at Thermo Fisher what they do. Like, there is a whole bunch of stuff, like I've never been to a board meeting, and I don't involve myself in patent prosecution. But what is their role, if

**any, in terms of deciding whether to bring patent litigation?**

**MR. MILLIKEN: Thank you, Your Honor. William Milliken on behalf of Olink.**

**So with respect to Dr. Finst, the first individual from whom we submitted a declaration, he is vice-president of litigation and generally oversees all litigation within Thermo Fisher and its subsidiary companies, and this would include intellectual property litigation and also general commercial litigation.**

**THE COURT: But I need you to focus on my question, because the issue here is can these folks -- just get the language here -- identify, select or conduct infringement analysis of any additional patents. Now, I'll say that I think that is -- okay. So that language to me is awfully broad, like you can't even conduct an infringement analysis and I agree with you, that's something that outside counsel would be allowed to do.**

**MR. MILLIKEN: Right.**

**THE COURT: But if I'm trying to figure out whether I just say no and go with what you have or whether there is room to edit what Defendants have proposed, my question is what is their role in terms of like who pulls the plug? Because when you look at the *PhishMe* case or the *Blackbird* case, those folks were like these were important**

10:15:25 decisions, they were decisions that had to be made by the CEO or the board and these folks were giving input, and so in those circumstances perhaps it was competitive decisionmaking.

10:15:38 MR. MILLIKEN: Uh-huh.

10:15:39 THE COURT: What I'm trying to figure out is where on the line do these folks fit in? Like is Ms. -- I'm guessing that Ms. --

10:15:51 MR. MILLIKEN: Ms. Hsu.

10:15:52 THE COURT: -- Hsu. She probably doesn't pull the trigger on --

10:15:58 MR. MILLIKEN: That is correct.

10:15:59 THE COURT: -- bringing litigation.

10:16:00 MR. MILLIKEN: She would not be the ultimate decisionmaker.

10:16:03 THE COURT: But I don't know -- like I can't tell for Mr. Finst. He just seems like he's significantly higher up. And so that one to me, I needed a little bit more understanding of like can he make a decision in terms of bringing new litigation.

10:16:25 MR. MILLIKEN: So with respect to Mr. Finst, he certainly is heavily involved in those sorts of decisions, the decision of whether to assert a patent against someone or what patents to assert against someone. I candidly do not know if he is -- would be the final decisionmaker on

such issues and I would imagine it might depend on the particular situation whether he would be making the final call or whether it would be something that, for example, the board of directors or the CEO would have to sign off on. But he certainly is involved in these types of decisions and that's the reason that we were unable to agree with this provision as drafted because this is sort of in the heartland of his responsibilities as vice-president of litigation.

And he also is very hands on in ongoing litigation, provides substantive input on pleadings, on developing arguments both legal and technical, and so in order for him to do both of those things, this provision would not work.

THE COURT: And I get what you're saying about the breadth of this, but where it falls -- gets a little weaker on your side for me is you're basically saying you just want him to be able to do what an outside counsel can do. But he does more if he's the one who says file that case, right, because that is more of a competitive decisionmaking. All an outside counsel can do or all a lower down counsel can do is say yeah, I analyzed this stuff, I think we have a good case and we should bring it. And I get it, that for either outside counsel or for in-house counsel, there is always a risk of inadvertent use

of what you know and we have to deal with that.

MR. MILLIKEN: Right.

THE COURT: But for someone who is like making the call, I'm not sure why that isn't competitive decisionmaking. Right? Like just saying I think we have a good case, that doesn't really -- I get it that that doesn't really seem like competitive decisionmaking. Saying we are going to bring a case against a competitor seems a little more competitive decisionmaking to me.

MR. MILLIKEN: So I think, Your Honor, that the only cases they have that suggest that providing that kind of input as in-house counsel on whether to bring a case, what patents to sue on, the only cases they have that say that's competitive decisionmaking are cases where the plaintiff was basically a patent assertion entity so the business was litigating.

THE COURT: *PhishMe* didn't seem -- I'm not sure, were there a patent litigation entity? I get it it was something like where they are in the lifecycle of their company that it was an important decision that had to be made by the board and he was integral in the board making it.

MR. MILLIKEN: I think litigation was a very significant part of their business. I guess you can debate what counts as a patent assertion and what doesn't. Thermo

Fisher and its subsidiaries, and in particular Olink, are in a very different situation. They do not derive a substantial value from licensing activities. Their business turns on producing and selling products, not suing people. I did a search this morning for how many patent cases at least the parent Thermo Fisher has been involved in in the past ten years and it's a pretty small number. So this is not something that is a big part of Dr. Finst's day-to-day responsibilities.

And one thing that I want to emphasize is there are already really stringent protections that the parties have agreed upon in this Protective Order. Of course there is a use restriction that says any of the information can only be used for purposes of the action. There is also a prosecution bar which includes any work --

THE COURT: Anything, not just editing claims.

MR. MILLIKEN: Correct. And there is an acquisition bar which arguably I think would not even be justified by the law, but we didn't mind agreeing to an acquisition bar and didn't want to burden the Court with that dispute because Dr. Finst isn't involved in patent acquisition. That's something that's handled by the business side of Thermo Fisher. And so his responsibilities do in our view fall squarely in the litigation bucket, not the competitive decisionmaking bucket as that term is used

10:21:04 in most of these cases. I think there are some cases where as I was discussing earlier where litigation was particularly important to the plaintiff's business where the court said oh, in that case, selecting patents for assertion does seem like it is very closely intertwined with the business of the plaintiff. That's just not true here. And there has been no suggestion by Alamar that that's true here.

10:21:27 And one final point that I think is relevant is because of the presence of the prosecution bar and the acquisition bar, in order for this concern that Alamar is hypothesizing to come about, we would have to be in a situation where Thermo Fisher or a subsidiary company just so happens to have a patent, an issued patent, issued claims that potentially read on Alamar's product. And then if Dr. Finst were to be involved in an analysis of that patent, he would have to somehow forget about these very strict use restrictions in this Protective Order that would prohibit him from using any information that he's learned by being signed on to the Protective Order in this case as part of doing that analysis.

10:22:17 Dr. Finst is a very careful lawyer. He takes his ethical obligations very seriously. And I don't think that Alamar has come close to showing that this additional restriction is justified based on this very speculative

argument about the potential harm from inadvertent misuse, I don't think it's plausible on this record on these facts.

THE COURT: Let me hear from Defendant.

MR. MILLIKEN: Thank you, Your Honor.

THE COURT: And from you, what I need to understand is this is very broad -- this is a very broad language, things like they can't conduct an infringement analysis of additional patents. So basically you're taking two people who are in the litigation area and they hire outside counsel and outside counsel says yeah, we think you can assert these patents. And they are not allowed to even look at what was done. And that just seems -- that seems excessive to me based on the speculation that perhaps they would remember something that they saw.

MS. KINGMAN: Understood. First to address your question, the idea is to prevent in-house counsel who access Alamar's highly confidential information from engaging in the strategic decisions about whether to assert patents against Alamar.

And --

THE COURT: That's not what that says. This is -- what you are proposing is identifying, selecting, or conducting infringement analysis of any additional patents for potential assertion against the producing party or against its customers on the basis of their use of producing

10:24:07 party's product. I don't even know what -- so identifying additional patents, selecting additional patents, or conducting an infringement analysis of any additional patents, that's broader than what you just said.

10:24:20 MS. KINGMAN: We do think that conducting infringement analysis is the type of activity in which it would be hard to compartmentalize --

10:24:28 THE COURT: But you still need to get them to be a competitive decisionmaker. Like how is it -- I apologize, I forgetting Ms. Hsu.

10:24:39 MS. KINGMAN: Ms. Hsu.

10:24:40 THE COURT: Like if she -- you're not preventing outside counsel from doing this, you're just preventing in-house counsel from doing that. So why if she is doing essentially -- I mean, she's litigation counsel, but she appears to be getting her paycheck from the company rather than a law firm. So why is it that it would be okay for a law firm to look at a patent and say -- a law firm -- say one law firm is here and say yeah, we think you have a good case, and they're going to compartmentalize and look at what they're allowed to look at, but she's not.

10:25:22 MS. KINGMAN: I think that I take your point that the conducting infringement analysis seems potentially a lower risk if it's not actually the decision about whether to assert a patent. And I think we would agree to a

narrower restriction that's focused more on the actual decision of whether to bring a lawsuit.

And it sounds like from what I have heard that Ms. Hsu should have no issue agreeing to an appropriate restriction on engaging in decisions about whether to sue Alamar based on additional patents.

And to the extent that Dr. Finst based on his role as Mr. Milliken acknowledged, he's heavily involved in making those decisions. To the extent he couldn't agree to this provision, it's not clear why Ms. Hsu would be insufficient as in-house counsel having access to highly confidential information.

THE COURT: Okay. And what is your best case to support the position that you are advocating? Because it did seem to me that there was emphasis in *Blackbird* and *PhishMe* on what the business here was. So you're a competitive decisionmaker when your business is largely based on litigating, and you're making litigation decisions.

MS. KINGMAN: Correct.

THE COURT: Nobody is arguing that Thermo Fisher's business is litigating, right? And so I'm not sure I see the tie between that, you know, making a decision, you know, yeah, I'm going to approve that litigation, I'm going to approve that litigation, and being a competitive litigator, especially when as he said there are so many

restrictions, they can't participate in getting the patents, all they can do is look at a patent or listen to outside counsel say yeah, we think you have a good shot or we think this is a valid and maybe infringed -- we think there is a good shot it's an infringed patent and he says okay, yeah, go ahead.

MS. KINGMAN: Right. So the cases in which courts in this district have considered whether selection of additional patents would be competitive decisionmaking are slightly different because there the defendant was actually seeking to preclude the in-house counsel from access at all. And that's not what we're trying to do here.

THE COURT: No, but there is language in there.

MS. KINGMAN: Right.

THE COURT: Like in *Blackbird*, Judge Andrews says I think he's -- you know, this is a litigation company, he's involved in competitive decisionmaking. In *PhishMe*, Judge Burke says well, you know, I get it that he's not making -- you know, they say the board makes this decision or the CEO makes this decision, but then he goes on to say but everybody agrees that this guy is super important in persuading them to do it because the CEO can't figure that out, this guy is the one who has to dig in and do it. And they also emphasize that it was because of the stage of the company where litigation was so important, the reason the

CEO had to get involved was because litigation was a huge part of what they were doing at the time. I mean, Thermo Fisher just seems different. And when we're talking about the fact that your -- that your harm is somebody doing something inadvertently, it seems like you need to have a little bit stronger of a showing.

MS. KINGMAN: Right. I think that both *Blackbird* and *PhishMe* stand for the proposition that this is a fact intensive inquiry. In *PhishMe* it's true that based on the stage of the company, the litigation was likely to be an important component of their business even though they were not a patent assertion entity.

The facts here are that Thermo Fisher is a huge company with a large patent portfolio and a large in-house legal department. And Alamar is a small competitor competing with them in a narrow segment of what they do with a single business unit and a single core technology. And Alamar also just recently expanded into the European market where Thermo Fisher has part of its global patent portfolio. Based on the positions of the parties, the risk to Alamar of inadvertent disclosure is more acute in this case. And the position of Thermo Fisher making strategic choices about how to handle this smaller competitor means that further protections are warranted under the particular circumstances of this case, particularly given what we heard about

Dr. Finst and his important role in evaluating cases for potential assertion against competitors.

THE COURT: Okay. Thank you.

Do you want to respond to that? First, why is Ms. Hsu not enough? Why do you need two people including someone who is more potentially involved in competitive decisionmaking and then respond to her concern with, you know, the risk to the Defendant.

MR. MILLIKEN: Sure. So the practical answer to why Ms. Hsu is not enough is simply that Dr. Finst has a great deal of experience in this area. He is very hands on when it comes to litigation of Thermo Fisher and his subsidiaries and Olink desires to leverage that substantial amount of expertise and skill that he brings to bear. He has knowledge that outside counsel can't replicate, and so that's a reason that the case law has recognized and justifies giving in-house counsel access to information even when there is some risk of inadvertent disclosure.

I'm advised by my co-counsel that Dr. Finst does not make the ultimate decision whether to file suit. His role is to provide recommendations to his internal client, the business based on his legal analysis, so I would submit in that role he is essentially no different from outside counsel. He's making recommendations just the same way as we are when we say we think you should file this suit or you

10:32:21 shouldn't file this suit. That puts him squarely out of the competitive decisionmaking bucket and it also leads to a problem with Alamar's argument that they're essentially trying to treat him differently just because he's in-house counsel even though his duties don't substantively differ from outside counsel.

THE COURT: Let me ask you this, and it's not because I think you're making a misrepresentation, but how comfortable are you in this assertion that you made? It's not in his declaration. I'm just trying to understand, is this based on an understanding? Did you go and text him? Did Mr. Ainsly text him? What are we basing this on?

MR. AINSWORTH: Your Honor, if may, Paul Ainsworth.

THE COURT: Ainsworth, sorry. Ainsly, Ainsworth, I was close.

MR. AINSWORTH: You were close.

Thermo Fisher has been my client for ten years. I have known Dr. Finst for ten years. From my own experience this is how they work, they take our advice and recommendations, and then they take that into this business. Each business has a general counsel that is the ultimate decider for what they're going to do. And so of course they're going to listen to his recommendation of whether they have a good suit or a bad suit, but Dr. Finst is not

the ultimate decisionmaker on any lawsuit. And I'm comfortable with that representation to the Court.

THE COURT: Okay. Thank you. All right. I didn't mean to cut you off. You mentioned that he told you that.

MR. MILLIKEN: Certainly, Your Honor.

Did Your Honor have a third question?

THE COURT: It was just, and maybe that is part of the answer to it, but I thought that it was the argument that because, you know, they are a smaller company they're sort of more at risk plus they're expanding into Europe and so the fact that there is kind of a growing competitor over here and there is potential to bring litigation to stymy them it sort of heightens the risk of even inadvertent usage.

MR. MILLIKEN: I think that is answered by the specifics of Dr. Finst's role. He is not involved in commercial strategy for Thermo Fisher and even when it comes to lawsuits, as we've just discussed, he's not the final decisionmaker, he's just providing a recommendation based on his legal expertise.

And so I think the thing that they are concerned about might be an issue if Dr. Finst's job was to, you know, make sure that Olink or that Thermo Fisher can forestall any competitive threat from Alamar going forward, but that's

just not what he does. He's in charge of all the company's litigation. His duties are squarely focused on litigation. He's not on the commercial side at all.

I think, again, I made this point earlier, but the only way that this risk could even come up is if there just so happened to be issued claims that the company already has and he's involved in the analysis and even then he would have to do something that the Protective Order specifically precludes, which is use the information he's gained as a result of this case.

THE COURT: How does this work in practice? I mean, is -- and tell me if I'm getting into work product and you don't want to answer because that's fine. But I'm trying to figure out just sort of practicality of this, did the folks who are in-house counsel, do they have like access to databases of produced documents or is it more that, you know, they see the contentions and they read all the briefs whether they're marked confidential or not? And, again, if you're not comfortable answering that, that's fine.

MR. MILLIKEN: I don't know that I can give you a blanket answer because it varies sometimes from case to case. But in my ten plus years of doing this, the typical way it happens is that in-house counsel will see specific documents. If, for example, they're going to be attached to an exhibit to a filing, they obviously see the substance of

**the material that's reflected --**

**THE COURT: Or they sit in a deposition.**

**MR. MILLIKEN: Or the expert report or they sit in a deposition. It's usually sort of secondhand exposure as opposed to going through and pouring through the technical documents themselves. I can't make a blanket statement that that never happens, but it's not the typical way I have seen it play out.**

**THE COURT: Thank you.**

**MR. MILLIKEN: Thank you.**

**THE COURT: And then I'll give you one last thing to respond to, anything he just said including the representation that was made.**

**MS. KINGMAN: Of course. So first with respect to the point opposing counsel made that the risk is low that Dr. Finst would be engaging in evaluation of additional patents to assert against --**

**THE COURT: Now we're talking about -- now you're just saying evaluation. Do you accept the representation that he's not the one who is making the call?**

**MS. KINGMAN: I do accept the representation. In *PhishMe*, the counsel also was not the one making the final call, but was advising the final decision makers.**

**THE COURT: Right. But that was again, there was some issue there where the size of the company and sort**

of where it was in its growth cycle or life cycle that litigation was much more important to this, there was a comment it has to go to the board in order to get approval for this because litigation was so important.

MS. KINGMAN: Understood.

THE COURT: Okay. Anything else you want to add?

MS. KINGMAN: I think just three quick points.

First, we're not seeking to preclude in-house counsel from access to highly confidential materials. We had originally proposed an outside counsel eyes only tier for access, given the high risk to Alamar as a small company with a single product, single product line and single technology. But in the interest of compromise we agreed to allow in-house counsel access. And we're just asking for this narrow restriction --

THE COURT: But it's not really narrow. That's part of my problem is you can't conduct an infringement analysis. Like you can't -- they cannot do things that outside counsel can do. They can't. I mean, they can't conduct an infringement analysis. They can't even like, if someone says hey, what do you think of this patent, they're like I'm out. And that's not what would apply to an outside counsel. And so then I think we get into well, the distinction would be like if they're involved in competitive

decisionmaking and that's where it's getting a little problematic for me. Like you're not just saying you can't make a call on whether to do this, you can't have a significant role in that, you're saying you can't even look at an additional patent.

MS. KINGMAN: I think that we would prefer to have a narrower version of the restriction that we proposed that does not have any protection in place at all to be clear. Let's focus on making the decision about whether to assert a patent and being heavily involved in that decision.

But we think that the restriction we have proposed because it's limited to evaluating additional patents for assertion against Alamar would still allow their in-house counsel to participate fully in this case. It only affects their ability to evaluate additional patents.

THE COURT: Right. But I think what they're saying is like let's say that Mr. Finst, he's -- let's say someone else wasn't involved in this, say the general counsel of the business unit that is involved hires outside counsel and says anymore patents we can assert against this little upstart over here and they say yeah, here is three. And the general counsel of the business unit says let's sue. You've now got a situation where these folks in the litigation department including folks who know this area and who have experience can't do their job.

MS. KINGMAN: You mean after the decision is made to sue?

THE COURT: Yes. This language is pretty broad. They're not allowed to do anything. They're not allowed to conduct an infringement -- they're not allowed to look at the infringement contentions.

MS. KINGMAN: I think we could adjust it to be limited to pre-suit infringement analysis if that would address that concern.

THE COURT: You're the one who wants the limitation. I'm not going to sit up here and negotiate with you. That's not my job. My job is to look at what you want and look at what they want and say one of you wins. I'm just looking at what you want and I'm telling you this seems too broad to address what you're saying is the concern.

MS. KINGMAN: I think that based on everything that I have had heard from Mr. Milliken, it sounds like Ms. Hsu would have no problem agreeing to refrain from participating in the selection of additional patents to assert against Alamar.

And with respect to Dr. Finst, to the extent that the risk is as small as they say it is, that they would not likely be involved in choosing additional patents to assert against us, then he should also be able to agree to a time limited bar that's also limited to the producing party

10:42:53 so it doesn't preclude him from broadly engaging in
10:42:57 enforcement decisions in this space.
10:43:00 And we think that the protection is warranted
10:43:02 because again, the relative positions of the company and the
10:43:07 high degree of relevance that this information would have to
10:43:11 decisions about when to assert patents, it would be hard to
10:43:20 compartmentalize when making those decisions. And Olink has
10:43:23 not identified any real prejudiced that's tied specifically
10:43:28 to this limitation given that it doesn't preclude their
10:43:33 ability to fully manage the litigation.
10:43:36 THE COURT: All right. Thank you.
10:43:38 So I have two provisions here. You can sit
10:43:43 down.
10:43:44 In the Protective Order, it's paragraph 10(c)
10:43:48 and the parties have agreed 10(c) is the dispute. The
10:43:54 parties have agreed to everything in paragraph 10 about
10:43:58 access to highly confidential information other than part C.
10:44:02 Part C Defendants propose should say that those with access
10:44:11 to confidential information may not identify, select or
10:44:14 conduct infringement analysis of any additional patents for
10:44:17 potential assertion against the producing party or against
10:44:20 its customers on the basis of their use of the accusing
10:44:26 party's product. I think the language of that is too broad
10:44:30 given the case law that we have in this area. It would
10:44:37 certainly as it's written preclude in-house counsel from

doing something that outside counsel can do.

And so then it seems to me that we should focus on whether somehow the in-house counsel are competitive decisionmakers, and here I don't think that I'm convinced that the two folks at issue, Mr. Finst and Ms. Hsu, are competitive decisionmakers in a way that should bar them from doing this. Their role at the company is litigation, not business. There has been a representation made that neither of them is the one that pulls the trigger or decides on what patents should be asserted in any given entity, that that is a decision made by the business unit or the general counsel of the business unit or someone higher up.

And I also think that although there are cases that say well, if you're involved in advising folks who make that decision, you might be a competitive decisionmaker. I'm not sure that the facts apply to the situation here where it's not a company where litigation is a significant aspect of its business, instead it's a company that just happens to litigate in addition to sort of as a result of its core technology business.

So I am not going to require that part C be added. If you all want to keep talking and see if there is some narrower restriction that applies, you may do so, but in the absence of agreement on that, within the next week or so submit to us a version of the Protective Order that

10:46:30 either includes what you have now agreed to or that removes
10:46:35 Section C.

10:46:35 All right. Is there anything else we need to
10:46:37 address?

10:46:39 MR. MILLIKEN: Nothing from Plaintiff, Your
10:46:40 Honor.

10:46:40 MS. KINGMAN: No, Your Honor.

10:46:41 THE COURT: All right. Thank you very much.

10:46:42 COURTROOM DEPUTY: All rise. Court is
10:46:44 adjourned.

(Court adjourned at 10:46 a.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Dale C. Hawkins
Official Court Reporter
U.S. District Court